## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-14349-CIV-MAYNARD

**KITTI VERONICA PARKER,**

     **Plaintiff,**

**v.**

**NANCY A. BERRYHILL, Acting Commissioner,**
**Social Security Administration,**

     **Defendant.**

_____/

### ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT (DE 17 & 18)

**THIS CAUSE** comes before this Court upon the above motions. Having reviewed the motions, the responsive pleadings, and the administrative record (DE 10), and having held a hearing thereon on June 18, 2019, this Court finds as follows:

### BACKGROUND

1.     The Plaintiff applied for supplemental security income ("SSI") under Title XVI of the Social Security Act on November 18, 2014. The application was denied on the first two levels of administrative review. On August 24, 2017, following a hearing, an Administrative Law Judge ("ALJ") rendered a decision finding the Plaintiff not disabled under the terms of the Social Security Act. The Appeals Council denied the Request for Review on June 28, 2018, thereby leaving the ALJ's decision final and subject to judicial review.

2.     The Plaintiff is a high school graduate and has vocational training as a nail technician. She reports having worked as a nail technician, and is a licensed cosmetologist in New York, North Carolina, and Florida. (R.60.) The ALJ found that her earnings have not risen

to the level of Substantial Gainful Activity ("SGA") since November 18, 2014, the date of her application for SSI.

3.      The medical record begins on January 29, 2012 when the Plaintiff sought treatment at St. Joseph's Physicians Hospital in New York. She returned to St. Joseph's on February 8th, complaining of insomnia, anxiety, depression, and pain in her upper gastrointestinal tract. (R.532.) She was diagnosed with symptomatic cholelithiasis and underwent a cholecystectomy (the removal of the gallbladder) on October 4th.

4.      On June 4, 2012, Plaintiff was involved in a car accident. While crossing an intersection, she was t-boned by a driver who had run a red light. She did not seek immediate medical care.

5.      It was not until a month later, on July 2, 2012, when Plaintiff visited Dr. Baird at the North Country Orthopedic Group on the referral of her attorney. She complained of neck pain radiating into her left upper arm with numbness, as well as tingling and pain in the left hip. (R.359.) An MRI of her cervical spine taken on July 10th showed cervical spondylosis at the C3–4 through C6–7 intervertebral discs without spinal cord compression. On July 19th, Dr. Baird reviewed her MRI results and determined that there was degenerative change in her cervical spine with mild spinal stenosis. There was no cord signal change nor acute disc herniation. Dr. Baird was "optimistic of slow improvement" in her symptoms. (R.358.) Plaintiff was prescribed Naprosyn and physiotherapy.

6.      She followed up with Dr. Baird on September 4, 2012. Her neck and hip were still hurting, and she also reported that her lower back had begun to hurt. (R.360.) She told Dr. Baird that she had started physical therapy and that it was relieving her neck pain. (There are no records of this physical therapy, however.) Dr. Baird recommended that she continue to

participate in physical therapy for her neck, back, and hip, and have a physiatrist conduct electrodiagnostic studies of her left upper extremity.

7.      On October 11, 2012, Plaintiff returned to Dr. Baird. She had yet to have the electrodiagnostic tests done. She told Dr. Baird that she was moving to Florida in the immediate future. Dr. Baird suggested she have the electrodiagnostic studies done in Florida, so she could address her problems there. Later that month, Plaintiff sold all her possessions and drove from New York to Florida.

8.      On November 8, 2012, she sought treatment from Dr. Anuj Prasher at South Florida Orthopedics. (R.486.) X-rays were taken of her cervical and lumbar spines. The x-rays revealed spondylosis in her cervical spine and evidence of grade 1 spondyloisthesis at the L4-5 level in her lumbar spine. Dr. Prasher ordered MRI's for both her lumbar and cervical spines, which took place on November 12th. The lumbar spine MRI revealed L4-5 mild grade 1 degenerative anterolisthesis and moderate facet joint and ligamentum flavum hypertrophy, with mild to moderate left subarticular recess narrowing with mild displacement of the descending left L5 nerve root and mild bilateral neural foraminal narrowing. (R.354.) The cervical spine MRI revealed multilevel disc osteophytes from the C3-4 through C6-7 levels with facet joint arthropathy. (R.351.)

9.      Plaintiff followed up with Dr. Prasher on November 15th. She reported she had moderate pain that occurred intermittently, aggravated by range of motion, driving, sitting, standing, and daily activities. Upon physical examination, her upper body strength was normal and she was able to walk without difficulty. She was not in apparent distress. Dr. Prasher noted that whiplash was likely the cause of her neck pain. He prescribed her Ultram, and injected her

with Bupivacaine, Lidocaine, and Depo-Medrol, which gave her immediate relief. (R.496.) She was referred to Mid-Florida Anesthesia Associates for pain management.

10.     Plaintiff presented to Mid-Florida on December 4, 2012. (R.443.) She was seen by Dr. Alvarez for an initial evaluation of her pain. She reported that she was continuing to work part-time. She also reported zero pain relief from physical therapy. (There are no records of this physical therapy, either.) Dr. Alvarez ordered a lumbar facet joint injection, by which to diagnose the source of her lower back pain.

11.     On December 11, 2012 Plaintiff received the first of two lumbar facet joint injections from Dr. Alvarez at Treasure Coast Center for Surgery. She reported reduced pain from a "7" to a "2" on a "0" to 10" scale. (R.442.) She received the second injection on January 8, 2013, which also reduced her pain. (R.438-9.)

12.     Because the Plaintiff's pain was relieved by the lumbar facet joint injections, the source of her back pain was determined to derive from the facet joints. On January 28, 2013, Plaintiff returned to Dr. Kuchera at Mid-Florida Anesthesia Associates. (R.432.) Dr. Kuchera explained the treatment options available to Plaintiff, and she and Dr. Kuchera agreed to proceed with a rhizotomy. A rhizotomy is a procedure that interrupts spinal nerve roots that travel through the facet joints. The intent of interrupting those nerves is to relieve pain arising from the facet joints.

13.     Plaintiff underwent the rhizotomy at Mid-Florida on February 6th. The procedure was successful and significantly reduced her pain. (R.430.) She did not seek additional treatment for four months.

14.     On June 28, 2013, Plaintiff returned to Mid-Florida Anesthesia Associates and was seen by Dr. Swartz. She reported to Dr. Swartz that her back pain had significantly

improved following the February rhizotomy. Her neck pain persisted and was worsening, however. (R.424.) Dr. Swartz recommended that she receive facet joint injections in her cervical spine to diagnose the cause of her pain and proceed with appropriate treatment. Her lumbar and cervical spine were stable, and she had normal tone, bulk, and strength. (R.426.)

15.     In July, she received two cervical facet joint injections. Both injections were successful and significantly reduced her pain. (R.421, 423.)

16.     On August 5th she returned to Dr. Kuchera at Mid-Florida Anesthesia Associates. Dr. Kuchera noted that she was "doing great after the cervical facet" injections. (R.414.) She reported that her back pain had returned and was radiating into her left leg, however. She also reported that she was forced to stop working as a nail tech due to the combination of back and neck pain. (R.414.) Dr. Kuchera ordered epidural steroid injections into her lumbar spine. She received the steroid injections on August 18th, which reduced her pain.

17.     Because the July cervical facet joint injections had reduced the pain in her cervical spine, Plaintiff was scheduled for a cervical rhizotomy. She underwent that procedure on September 4, 2013. The procedure was successful and provided her with significant relief. (R.411.)

18.     The Commissioner sent the Plaintiff to a consultative psychological evaluation conducted by Dr. Mihalovich on September 18th. When asked why she was applying for benefits, she identified intrusive thoughts. (R.333.) During the evaluation, she discussed her prior addiction to cocaine and her criminal record. She explained that she cannot take opioid medication for pain because of her addiction. She is divorced, has two adult children, lives alone, and spends her day caring for her home and looking for work. She has some friends and family and chooses not to date. She is heavily involved in AA and sometimes attends church. She is a

licensed cosmetologist in New York, North Carolina, and Florida, and has been looking for work since moving to Florida. Dr. Mihalovich noted that she presented herself in an appropriate fashion, displayed normal motor skills, was alert and oriented, and thought logically. Dr. Mihalovich determined that she had dysthymia, anxiety, and cocaine dependence. Her cognitive abilities appeared to be intact, and her judgment and insight were appropriate for independent living. Dr. Mihalovich determined she was capable of managing her benefits.

19.     In October 2013 Plaintiff presented to Dr. Alvarez to receive a facet joint injection in her lumbar spine. The injection reduced her pain. On November 27, 2013 she underwent another lumbar rhizotomy, which again provided relief. (R.394.)

20.     On December 27th she returned to Dr. Kuchera for a follow-up on her lumbar rhizotomy. She reported that the pain in her low back was severe, but she was able to perform activities of daily living without assistance. (R.388.) Her range of motion was mildly decreased and functional, and her lower back exhibited mild tenderness. Her cervical and lumbar spines were stable, and she demonstrated normal tone, bulk and strength in her upper extremities. (R.390.) Dr. Kuchera ordered her to have three additional lumbar steroid injections.

21.     On January 21, 2014, Dr. Alvarez administered the first of the three steroid injections into her lumbar spine. (R.386.) The injection significantly reduced her pain. (R.387.) The record does not show that she returned for the remaining two injections.

22.     She did not seek additional medical treatment until July 14, 2014, when she was seen by Dr. Huang at the North Country Orthopedics Group in New York. (R.363.) She complained of continuous back and neck pain. She stated that pain was exacerbated when "working doing pedicures, like standing for a long time, sitting for a long time." She also reported that having "a good night's sleep" alleviated her pain. X-rays were taken of her spine

and she was diagnosed with cervical spondylosis and degenerative disc disease. There were no "red flags" in her history or exam to indicate "more urgent work up." (R.364.) Dr. Huang recommended Plaintiff proceed with physical therapy.

23.    On August 26th she returned to Dr. Huang. Her pain had not changed. It was exacerbated when she worked and alleviated by lying down. (R.365.) She reported that physical therapy had helped some but did not fully relieve her pain. (There are no records of these physical therapy sessions.) Dr. Huang prescribed her Lidoderm and ordered another MRI of her lumbar and cervical spines. (R.365.)

24.    Plaintiff visited Northern Radiology Imaging on September 8, 2014 and underwent an MRI of her cervical and lumbar spines. The study revealed diffuse disc bulges in her lumbar spine, indicative of degenerative change. (R.371.) The study of her cervical spine revealed cervical spondylosis at the C3-4 through C6-7 levels without spinal cord compression, and foraminal narrowing. Dr. Wasenko noted that there was not a significant change compared to the previous study. (R.372.)

25.    On September 26, 2014 Plaintiff returned to Dr. Huang to follow up on the MRI. Her pain had not changed since her last visit. The Lidoderm medication had given her some relief, however. She reported that her pain was exacerbated by working, but "since [she] stopped working it is awesome." She also requested "renewal of total disability." (R.367.) (Of note, the record shows no prior opinion statement of "total disability.")

26.    On October 27, 2014, Plaintiff presented to Dr. Prasher in Florida with the same complaints of pain. (R.461.) Upon examination, she exhibited mild tenderness in her lumbar spine and a moderate restriction of range of motion. Her gait was normal, however. (R.463.) Dr. Prasher noted that if her pain persisted in her lumbar spine, she may "be a good candidate for a

minimally invasive lumbar fusion at L4-5." (R.464.) Plaintiff did not undergo lumbar fusion treatment, however. Dr. Prasher and the Plaintiff decided to proceed instead with additional facet block injections in her cervical and lumbar spines.

27.     On November 13, 2014 she returned to Dr. Swartz at Mid-Florida Anesthesia Associates. (R.380.) She was using a cane and her gait was described as waddling. (R.382.) She was not in acute distress, however, and she was able to perform activities of daily living without assistance. (R.381.) The physical examination revealed her lumbar and cervical spines to be stable, her range of motion to be mildly decreased, and her upper extremities to be normal.

28.     Plaintiff applied for Supplemental Security Income on November 18, 2014. (R.209.) She alleged disability due to neck and back pain, anxiety, and depression, beginning on January 1, 2012. (R.228-9.)

29.     On December 10, 2014, she went to see Dr. Levine at Mid-Florida. (R.375.) She reported radiating pain across the lower back, as well as pain originating in the central neck and radiating across the occipital region. She reported that activity in general made the pain worse and that it could only be relieved by resting. Dr. Levine noted that her cervical and lumbar spines were both stable, and that she could perform her activities of daily living without assistance. (R.376, 378.) The Plaintiff reported that she travels to New York for the summer and returns to Florida for the winter. She stated that she had been out of work for five months per her doctor's instructions. (R.375.) (The record does not contain any such work release instruction, however.)

30.     On December 30th she returned to Dr. Prasher. (R.465.) Her medication included Ibuprofen, Lidoderm patch, Ambien, Ultram, and Viibryd. She reported that her low back pain was worsening. Dr. Prasher noted that she would "have work limitations due to her pain" but did not further define or elaborate on her limitations. Instead, Dr. Prasher recommended she continue

with pain management and undergo a functional capacity evaluation to discern her limitations. (R.467.) There are no records of Plaintiff undergoing such an evaluation, however.

31.     On January 20, 2015 Plaintiff saw Dr. Alvarez and received cervical facet joint injections. The injections again provided significant relief to her pain. (R.458.)

32.     On January 28, 2015 Plaintiff suffered a sudden finger injury and presented to Physicians Immediate Care. (R.481.) While Plaintiff was helping her friend lift a hutch, the friend lost her grip of the hutch and dropped it, landing on the Plaintiff's finger. Her finger was bandaged, and she was prescribed acetaminophen-hydrocodone. A physical examination revealed she had normal gait, and the medical record notes that she did not have pain in the neck, back, or joints. (R.482.) She did appear to be extremely nervous about the incident, however.

33.     The Commissioner sent the Plaintiff to a second consultative psychological evaluation, this time conducted by Dr. Sullivan, on February 4, 2015. (R.452.)  Dr. Sullivan noted that Plaintiff exhibited normal cognition. Dr. Sullivan further described the Plaintiff's thought process as coherent, and her thought content as relevant. Her immediate memory was fair, recent memory appeared adequate, and her remote memory appeared to be grossly intact. Plaintiff discussed her drug use and how it negatively impacted her mental health. She was arrested over 40 times and physically abused while she was using. She often thinks about her past which causes her anxiety, and she cannot date because of the past abuse. She was once hospitalized at a psychiatric facility, and once took psychotropic medication but was forced to stop because her insurance ran out. She stated that she last worked full-time in 2013 but tries to work part-time as much as she can. She was diagnosed with PTSD, dysthymia, and stimulant use disorder. Dr. Sullivan recommended she see a psychiatrist regarding medication management of her anxiety and depression, and participate in counseling.

34.     On February 19, 2015, Dr. Jessy Sadovnik, a non-examining psychological advisor rated Plaintiff's mental Residual Functional Capacity ("RFC"). (R.73.) Dr. Sadovnik noted that while the Plaintiff may continue to experience some symptoms of depression and PTSD at times, she was still functional from a mental perspective, and could perform many routine activities of daily living without assistance. Sadovnik determined Plaintiff capable of independent functioning and that her mental impairments were not severe. (R.75.)

35.     On February 23, 2015, Dr. Lise Mongul, a non-examining medical advisor, rated the Plaintiff's physical RFC. Dr. Mongul determined she had exertional limitations. (R.76.) However, she could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. It was noted that she may need additional interventional procedures, but she only had mild limitations in her range of motion, and normal gait and strength. She could occasionally climb ramps, stairs, ladders, ropes, scaffolds, and occasionally balance, bend at the waist, kneel, crouch, and crawl. (R.76-7.) Dr. Mongul noted that Plaintiff has some limitations in the performance of work activities, but the limitations would not prevent her from performing past work as a nail tech. (R.78.) Dr. Mongul determined that she is not disabled. (R.79.)

36.     On February 24, 2015, the Social Security Administration denied Plaintiff's application for Supplemental Security Income at the initial determination stage. (R.101.)

37.     On April 15, 2015, Plaintiff presented to Dr. Prasher, complaining of pain in her cervical and lumbar spines. (R.469.) She reported "good relief" in her lumbar spine after the facet block injections. Her neck pain persisted, however. (R.471.) Dr. Prasher again noted that she would have work limitations due to her pain but did not elaborate. (R.471.) After discussing treatment plans, Plaintiff and Dr. Prasher elected to proceed with another round of cervical facet injections and a subsequent rhizotomy.

38.     On April 24, 2015, Dr. Jennifer Meyer, a non-examining psychological advisor, rated the Plaintiff's mental RFC (at the reconsideration level of review). (R.89-91.) Dr. Meyer reported that Plaintiff's activities of daily living and social functioning appeared grossly intact from a mental standpoint. (R.91.) Plaintiff's reported severity of her symptoms, and related limitations, were not supported by the objective evidence. Dr. Meyer noted that the Plaintiff's mental status issues were mild in nature, and there was no evidence of a worsening mental condition. (R.91.)

39.     On May 17, 2015, Dr. Bixler, a non-examining medical advisor, rated the Plaintiff's physical RFC (at the reconsideration level of review). (R.91-5.) Dr. Bixler determined that she had exertional limitations. She could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (R.92.) She could stand and/or walk and sit for six hours in an eight-hour work day. She has postural limitations, but can occasionally climb ladders, balance, stoop, kneel, crouch, and crawl. (R.92-3.) Dr. Bixler determined that she can perform light work and found her not disabled. (R.95.)

40.     On May 20, 2015, the Commissioner denied the Plaintiff's appeal at the reconsideration level. (R.104.) The Commissioner noted that Plaintiff's statements on the intensity of her symptoms were inconsistent with the objective medical evidence. She was able to communicate, act in her own interests, adjust to ordinary emotional stresses, get along with others, and do her usual daily activities without assistance. (R.98.)

41.     On May 22, 2015, Plaintiff returned to the North Country Orthopedic Group in New York to see Dr. Huang. (R.562.) She complained that her neck and back pain were significantly worse. She stated that the neck pain "got worse in the sense that her [right] shoulder started bothering her about a month ago and then she started noticing numbness and tingling

down her upper extremity fairly spontaneously." (R.562.) Dr. Huang noted that her shoulder did not appear irritable upon examination, and that her shoulder range of motion was normal and without pain. She was able to take her jacket and shoes on and off, transfer from sit to stand and stand to sit, and climb on and off the examination table independently. Also, Dr. Huang reported that she was well-developed, well-groomed, pleasant, and in no acute distress. Dr. Huang recommended Plaintiff participate in physical therapy. He also ordered updated MRI's for Plaintiff's lumbar and cervical spines, as well as electrodiagnostic tests of her right shoulder and arm. (R.563.)

42.    On June 11, 2015, Plaintiff presented to Dr. Wasenko at Northern Radiology Imaging in New York for the MRI that Dr. Huang had ordered. Dr. Wasenko performed an MRI of both her lumbar and cervical spines. The cervical MRI revealed cervical spondylosis without spinal cord compression. (R.574.) The lumbar MRI revealed disc bulge at the C2-3 level, minimal central canal stenosis at the L3-4 and L4-5 levels, and diffuse disc bulge at the L5-S1 level. (R.576-7.) Dr. Wasenko noted that there were no changes compared to the study conducted on September 8, 2014.  (R.577.)

43.    On June 19th she returned to Dr. Huang for an MRI follow-up. (R.567.) She reported that her neck pain was extending down the right shoulder and into her hand, causing a tingling and numbness in her little finger. When asked what exacerbated her pain, she replied, "I guess overdoing it." When asked what relieved her pain, she replied, "just laying flat on my back I guess." Dr. Huang noted that the most recent MRI's of her cervical and lumbar spines did not show a problem in need of urgent care. The report of her interval right shoulder x-rays were reviewed and "essentially normal." (R.567.) Dr. Huang recommended she proceed with

conservative treatment methods such as physical therapy. She was to revisit for monitoring and to have additional electrodiagnostic tests on her right shoulder. (R.568.)

44.     Plaintiff returned to Dr. Huang on July 1st. (R.564.) She reported that her shoulder pain was the same. She described the severity of the pain as a "ten" out of "ten" on the analog pain scale. The pain could be relieved by "shaking it out" or repositioning. (R.565.) Nonetheless, Dr. Huang noted that there was overall improvement in her ailments. She was able to transfer from sit to stand, stand to sit, and on and off the examination table independently. (R.565.)

45.     Plaintiff also underwent diagnostic tests during the July 1st visit with Dr. Huang. The tests did not reveal a cause of her right shoulder and arm pain. The tests did reveal degenerative changes in her hands, however. (R.566.) Dr. Huang concluded that Plaintiff had an element of carpal tunnel syndrome. Dr. Huang recommended physical therapy, to which Plaintiff was hesitant to proceed with, as she claimed it had not helped her before. Dr. Huang advised her to wear a splint on her wrist.

46.     Plaintiff presented to Dr. Huang again on July 31st, complaining of the same pains in her back and neck. (R.569-70.) Initially, she reported no pain in her upper extremities. But later she mentioned that she had pain in her right hand. She described the pin as intense and was exacerbated when she tried to sleep. (R.570.) She had not yet used the recommended wrist splint. (R.571.)

47.     Between August 2015, and February 28, 2017, Plaintiff was treated for her back and neck pain only once, in May of 2016, when she presented to St. Joseph's Hospital for a general visit. She exhibited mild tenderness in her lower back. Her conditions were listed as

stable and she was recommended to eat healthy and stay active. She requested refills of Ibuprofen and Prozac.

48.     On February 28, 2017 she returned to Dr. Prasher, complaining of worsening pain in her left lower back, around the buttock area. (R.595.) She was taking Ambien, Ultram, Lidocaine, and Ibuprofen at the time. Dr. Prasher and the Plaintiff decided on a trial with gabapentin and Flexeril. Dr. Prasher noted she had would have work limitations but did not specify those limitations. (R.600.)

49.     A letter to the Social Security Administration ("SSA") dated March 30, 2017 reveals that Plaintiff was in Chicago staying with her fiancé for the summer of 2017. (R.145.)

50.     On June 8, 2017, Plaintiff visited St. Joseph's Hospital for an office visit. She had mild tenderness in her lower back with pain when bending over. She exhibited normal range of motion in her neck. (R.622.)  Her cognition and memory appeared normal, and she did not have trouble sleeping. (R.622.) She had normal strength, coordination, and no sensory deficit. She requested a refill of muscle relaxers which was providing moderate relief to her pain. It was recommended that she eat healthy, exercise, and stay hydrated. (R.620.) She was scheduled for a follow-up in a year. This is the last record of Plaintiff's treatment.

51.     The Plaintiff testified at the hearing held on July 19, 2017. (R.39-65.) She repeated her claims of neck and back pain, anxiety, depression, and substance use disorder. She can stand and walk around for about ten minutes and sit down for five or ten minutes. She has problems sleeping because of her pain. She can lift and carry five pounds. She does not have any problem using her hands and arms to reach up and grab things, but she cannot stoop, kneel, or crouch. She can take care of her personal needs such as preparing meals and hygiene. She does not use a cane or walker for assistance. She has a car and uses it to go grocery shopping. She also

has depression, anxiety, and PTSD. She has problems maintaining concentration and attention because of her mental problems.

52.     At Step Two of the disability analysis, the ALJ found the Plaintiff to have the severe impairments of degenerative disc disease of the neck and low back. The ALJ found the Plaintiff's depression and anxiety to cause no more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere. The ALJ determined that the Plaintiff's medical conditions are not wholly disabling and found the Plaintiff capable of performing a reduced range of light work despite them. The ALJ noted that objective medical findings were inconsistent with the Plaintiff's allegations of disabling limitations.

53.     The ALJ explained why he assessed the Plaintiff's RFC for a reduced range of light work rather than wholly disabled. The ALJ noted that, in her most recent treatment, Plaintiff demonstrated normal strength and no sensory deficit, and her coordination was normal. He also noted that the injections, the rhizotomy procedures, and the prescribed medications provided relief for her pain. The ALJ considered the fact that Plaintiff went nine months without treatment two separate times. Moreover, Plaintiff could perform daily activities without assistance, drives from Florida to New York, and was recently engaged, none of which suggests intractable pain.

54.     The ALJ went on to consider the Plaintiff's mental impairments. The ALJ considered both the state agency psychological evaluations and the consultative evaluations. He noted that the mental status examinations were unremarkable. Also, the Plaintiff does not currently seek mental health treatment with a psychologist or a psychiatrist. She is able to pay bills, drive a car, and care for her personal needs independently, thus her mental impairments are nonsevere.

55.     The state agency medical advisors opined that Plaintiff could perform light work with postural limitations. The ALJ gave great weight to their opinions for being consistent with the record as a whole and supported with relevant evidence. The ALJ accorded little weight to Dr. Prasher's opinion that Plaintiff has pain-related work limitations because Dr. Prasher had not specified what they are in RFC-equivalent terms.

56.     The Plaintiff had no "past relevant work" because her reported earnings did not rise to the SGA level. Thus, the ALJ had to determine whether there was any work in the national economy that the Plaintiff could perform, considering her RFC, age, education, and work experience. Based on the testimony of the Vocational Expert ("VE") and the *Dictionary of Occupational Titles*, the ALJ found the Plaintiff able to perform the occupational requirements of Housekeeper, Towel Folder, and Garment Sorter. The Plaintiff is capable of making a successful adjustment to work that exists in significant numbers in the national economy, and therefore is not disabled.

## DISCUSSION

57.     Judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether the proper legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). Supporting evidence need not be preponderant to be substantial so long as it amounts to more than a scintilla; in other words, it is such relevant evidence that a reasonable person might accept as sufficient and adequate to support the conclusion reached. See id. at 1440. If the decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court re-weigh the evidence nor substitute its judgment for that of the ALJ. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th

Cir. 2002). While the Commissioner's factual findings enjoy such deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007). See generally, Jordan v. Comm'r, 470 Fed.Appx. 766, 767-68 (11th Cir. 2012).

58.    The Plaintiff asserts that the ALJ's finding that she is capable of performing light work with postural limitations is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ should have recontacted Dr. Prasher for a more specific assessment of her work limitations, or order a consultative examination to discern her limitations. Alternatively, the Plaintiff argues that the ALJ was unconstitutionally appointed, and that this Court must remand her case to be heard by a different and constitutionally appointed ALJ.

59.    This Court begins by considering whether the ALJ should have recontacted Dr. Prasher. Generally, a treating physician's opinion is entitled to more weight, and will be given controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. See 20 C.F.R. § 416.927(c)(2). However, "[a] treating physician's report 'may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.'" See Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1159-60 (11th Cir. 2004) (citing Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991)). If a treating source opinion is not supported by the evidence and the ALJ cannot ascertain the basis of the opinion, the ALJ "must make every reasonable effort to recontact the source for clarification of the reasons for the opinion." SSR 96-5p.[1]

---

[1] This SSR was rescinded on March 27, 2017. It still applies to all claims filed before March 27, 2017, however. Thus, it is applicable here.

60.    The ALJ's decision that the Plaintiff can perform light work with postural limitations is supported by substantial evidence. Plaintiff was consistently diagnosed with mild degenerative disc disease. There is no evidence of a significant change in her diagnosis to support her allegations of worsening pain. Moreover, in physical examinations, she often demonstrated normal gait and strength, and she was not in acute distress at any time. Furthermore, the treatment she received, such as the facet joint and steroid injections, the rhizotomy procedures, and the prescribed muscle relaxer, consistently provided pain relief. Finally, Dr. Prasher's notes are vague, ambiguous, and not based on objective medical evidence. An ALJ does not have to give a treating physician's opinion controlling weight when not based on objective evidence. Crawford, 363 F.3d at 1159-60. For these reasons, the ALJ had substantial objective evidence to support his decision.

61.    The ALJ's decision is also bolstered by the totality of the record. For example, Plaintiff consistently attributed her ailments to a car accident from June 4, 2012. However, she did not seek medical treatment immediately after the accident. In fact, she did not see a physician until July 2nd, a month later, when she was referred to Dr. Baird by an attorney. Also, the Plaintiff went long periods of time without receiving treatment, and often failed to follow through with recommended treatment. The only instance where she sought emergency care was when she suffered a finger injury while helping a friend lift a china cabinet. Moreover, she drives from New York to Florida, and then back to Florida, at least once per year. She also continuously reported she was able to perform her activities of daily living. Such evidence further supports the ALJ's decision that Plaintiff is not wholly disabled.

62.    That is not to say that the ALJ completely rejected Dr. Prasher's note that the Plaintiff would have work limitations. The ALJ determined that the Plaintiff has severe

impairments of degenerative disc disease of the neck and low back, and that those impairments more than minimally limit her ability to work. The ALJ accounted for her limitations while determining her RFC. There is no objective medical evidence in the record that Plaintiff's impairments are worse than what the ALJ determined. Because the ALJ accepted Dr. Prasher's opinion concerning Plaintiff's work limitations to that extent, SSR 96-5p does not apply.

63.    Plaintiff also contends that the ALJ should have ordered a consultative examination concerning her functional limitations. The SSA may require a consultative examination in various situations, such as when one would be necessary to resolve inconsistencies in the record, when the evidence as a whole is insufficient to make a disability determination, or if the additional evidence needed is not contained within the available record. 20 C.F.R. § 404.1519a(b). The ALJ has discretion to determine when a consultative examination is necessary, however. Nonetheless, for the same reasons set forth above, the ALJ had sufficient evidence to determine Plaintiff's functional capacity and was not obligated to order a consultative examination. There was no need for the ALJ to send the Plaintiff for another MRI or physical examination because the record already contained numerous such evaluations. Moreover, Dr. Prasher referred the Plaintiff to a functional capacity evaluation to determine her work limitations, which she failed to do. This Court notes that ultimately it is the Plaintiff's burden to prove her disability claim, see Ingram, 496 F.3d at 1269 (citing Doughty v. Apfel, 245 F.3d 1274 (11th Cir. 2001)), and that burden of proof carries with it the obligation to proffer into the record all relevant medical evidence that might support her claim.

64.    Plaintiff alternatively argues that the SSA ALJ who adjudicated her case was unconstitutionally appointed. Plaintiff reasons that because the SSA ALJ was unconstitutionally

appointed this case should be remanded to the administrative level to be adjudicated by a constitutionally appointed ALJ.

65.    Under the Appointments Clause, "Officers of the United States" may only be appointed by the President, a Court of Law, or Heads of Departments. U.S. CONST. Art. II. § 2, cl. 2. Plaintiff relies on the Supreme Court's holding in <u>Lucia</u> that SEC ALJ's are "Officers of the United States" within the meaning of the Appointments Clause. <u>Lucia v. S.E.C.</u>, 138 S.Ct. 2044, 2056 (June 21, 2018). Plaintiff reasons that because SEC ALJ's and SSA ALJ's perform similar functions, SSA ALJ's should also be considered "Officers of the United States." Justice Breyer's concurrence in <u>Lucia</u> suggests that SSA ALJ's may not fall under <u>Lucia</u>'s analysis, however. <u>Lucia</u>, 138 S.Ct. at 2058. There is no binding authority that asserts SSA ALJ's are "Officers of the United States."

66.    Even if SSA ALJ's were to be considered Officers, Plaintiff cannot raise this issue for the first time on appeal in federal court. In <u>Lucia</u>, the Plaintiff "contested the validity of" the SEC ALJ's appointment first to the SEC itself. <u>Lucia</u>, 138 S.Ct. at 2055. The Court allowed Plaintiff to raise the argument because it had been raised timely in the administrative proceedings prior to review in federal court. <u>Id.</u>

67.    After the Supreme Court's decision in <u>Lucia</u> many Social Security claimants have raised Plaintiff's argument. The majority of courts that have heard this argument determined that the issue may not be raised for the first time in federal court. <u>See</u> <u>Marchant v. Berryhill</u>, 2019 WL 2268982 at *3 (E.D.Pa. May 28, 2019). <u>But</u> <u>see</u>, <u>Bizarre v. Berryhill</u>, 364 F.Supp.3d 418 (M.D.Pa. Mar. 4, 2019) <u>and</u> <u>Bradshaw v. Berryhill</u>, 372 F.Supp.3d 349 (E.D.N.C. Mar. 26, 2019). Although the Eleventh Circuit has yet to decide this issue, the courts within this circuit have held that an Appointments Clause challenge, in the context of social security disability

proceedings, is nonjurisdictional and must be raised at the administrative level. See Jones v. Berryhill, 2019 WL 2583157 at *7 (N.D.Fla. June 21, 2019). See also Valle-Roman v. Comm'r of Soc. Sec., 2019 WL 1281171 at *2 (M.D.Fla. Mar. 20, 2019); Perez v. Berryhill, 2019 WL 1405642 (S.D.Fla. Mar. 28, 2019). Both the Middle and Southern District of Florida have declined to allow this argument to be raised after the ALJ's decision became final.

68.     Plaintiff also relies on the Supreme Courts holding in Sims. In Sims, the Court held that a Social Security claimant does not have to exhaust issues when appealing the SSA ALJ's decision to the SSA Appeals Council. Sims v. Apfel, 120 S.Ct. 2080, 2086 (2000). The Court reasoned that the non-adversarial and inquisitorial nature of SSA administrative proceedings, where it is the ALJ's duty to investigate the facts and develop the arguments for both sides, preclude requiring issue exhaustion at the SSA administrative level. Id. at 2085. The Plaintiff in Sims had raised their issues to the ALJ, but neglected to include all of the issues in its appeal to the SSA Appeals Council. Id. at 2081. Sims does not stand for Plaintiff's argument that an SSA claimant may raise issues for the first time in federal court, however.

**CONCLUSION**

69.     It is not for this Court upon judicial review to re-weigh the evidence or reach findings of fact anew; such is the responsibility of the ALJ as the fact-finder in this case. In other words Social Security law does not permit this Court to make its own decision about whether to grant or deny the Plaintiff's disability application. Social Security law instead limits the scope of consideration to reviewing the ALJ's decision on appeal. This Court's review is limited to ensuring that the ALJ's findings of fact are supported by competent, substantial evidence and that the decision comports with the governing law and regulations. Social Security law thereby gives a certain degree of deference to the ALJ's decision. Having reviewed the parties'

arguments and having independently and carefully reviewed the whole record, this Court finds the decision to have such support, with no grounds warranting reversal or remand.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment (DE 18) is **DENIED.** In affirming the ALJ's decision, the Defendant's Motion for Summary Judgment (DE 17) therefore is **GRANTED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this ＿＿＿day of July, 2019.


SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE